**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Case |
| | ) | |
| KW INTERNATIONAL, LLC | ) | Case No. 23-90708 |
| | ) | |
| Debtor. | ) | |

**DECLARATION OF GREG HATFIELD IN SUPPORT OF FIRST DAY MOTIONS**

I, Greg Hatfield, state and declare as follows:

1. I am over 18 years of age, of sound mind, and fully competent to make this Declaration (the "Declaration") on behalf of KW International, LLC ("Debtor"), the debtor-in-possession in this bankruptcy case, in support of the Debtor's first day motions, including these specified below. If called upon to testify, I could and would competently testify to the matters set forth herein.

2. I am the Chief Financial Officer ("CFO") of the Debtor. Based upon my personal knowledge as the CFO of the Debtor and its business operations, ownership, history, industry, and book and records, and based upon the information contained in the Debtor's books and records, I am both knowledgeable and qualified to make this Declaration on behalf of the Debtor. Some of the information contained herein is based upon my review of data regularly compiled by the Debtor in the ordinary course of its business.

**I.      About The Debtor**

3. The Debtor has been in business for more than 60 years and manufactures a complete line of production and measurement equipment for oil and gas companies, pipeline operators, and others in the midstream and upstream segments of the oil and gas industry. The Debtor offers both pre-engineered equipment as well as equipment customized to a customers' specifications. The Debtor's products include: (i) production equipment used for oil and gas separation, dehydration, conditioning, and treatment, (ii) oil and gas measurement equipment,

1

including gas measurement systems, which measure the amount of liquid oil and gas at the time of transfer, and (iii) a variety of automated systems, controls, and instrumentation relating to the equipment.

4. The Debtor's executive officers are located in Houston, Harris County, Texas.

5. The Debtor's manufacturing facility is located in Columbus, Texas, near Interstate 10. This facility is located on about 20 acres, of which approximately 140,000 square feet are under roof. The facility includes a 100-ton crane capacity, a stress oven rail system, and a blast and paint booth. This facility can be viewed on the Debtor's website: www.kwintl.com. This state-of-the-art facility allows the Debtor to provide off-the-shelf designs and customized systems to fit its customers' needs and specifications. The Debtor currently has a backlog of orders of approximately $40 million.

6. The Debtor's human resources are a significant source of strength. The Debtor has a strong and experienced management team and has improved the skill set throughout the organization during the past several months. These human resources, joined with the Debtor's state-of-the-art facility, allow it to provide customized systems to fit its customers' needs.

7. However, from 2020 to early-2022, as a result of the COVID-19 pandemic and related global supply chain issues, the Debtor encountered financial difficulties. The Debtor's financial condition also deteriorated in 2020-2021 due to increased material costs, significant turnover in key management roles, and poor performance until qualified replacements could be found. Consequently, in late 2021, the Debtor began working with a financial advisory services firm in an effort to restructure its financial obligations outside of a Chapter 11 bankruptcy process. As a result of the Debtor's prior financial restructuring efforts, the Debtor obtained financing through three (3) different parties – a factoring company for the Debtor's accounts

receivable, an inventory lender for the Debtor's inventory, an equipment lessor/lender[1] for the Debtor's equipment, and a promissory note secured by real estate owned by the Debtor.

8.  Unfortunately, the Debtor's attempts to restructure outside of the Chapter 11 process were not sufficient, and the Debtor lacks the resources to execute its substantial backlog of orders on a timely and profitable basis.  Under the current circumstances, the Debtor believes that the best and most prudent course of action to maximize the value of the Debtor's assets and balances is to conduct on expeditious sale of the Debtor's assets and business as a going concern through a sale pursuant to section 363 of the Bankruptcy Code.  For this purpose, the Debtor intends to retain SSG Capital Advisors, LLC to act as investment bankers to conduct a sale process relating to the Debtor's business and assets.

## II.  The nFusion Factoring/Cash Collateral Motion

9.  The Debtor is a party to an Accounts Receivable Purchasing Agreement (as modified and amended, the "Factoring Agreement," with nFusion Capital Finance, LLC ("nFusion"), which provides for the sale of accounts from the Debtor to nFusion.  The Factoring Agreement is addressed in detail in the *Emergency Motion For (I) Interim And Final Orders (a) Authorizing The Debtor To Factor And Incur Post- Petition Secured Indebtedness, (b) Granting Security Interests And Super-Priority Claims, and (c) Authorizing Use of Cash Collateral and Granting Adequate Protection; and (II) an Order Scheduling A Final Hearing* ("nFusion Motion") filed by the Debtor substantially contemporaneously with this Declaration.  Reference is here made to the nFusion Motion which accurately describes the existing factoring arrangement. The Debtor's accounts are sold and transferred by the Debtor to nFusion pursuant to the Factoring Agreement with full recourse to the Debtor and an obligation by the Debtor to repurchase them from nFusion.  Consequently, the factoring arrangement has aspects of both a sale of an asset and a financial aspect based on the Debtor's obligation to repurchase the

---

[1] Although the agreement with the Debtor's equipment lender takes the form of a Master Lease Agreement, the Debtor reserves all rights with respect to whether the Master Lease Agreement is a true lease or an equipment

accounts.  nFusion is granted a blanket lien on the Debtor's assets other than Avoidance Actions (as such term is defined in the nFusion Motion) to secure the Debtor's obligations to nFusion.

10. The ability for the Debtor to monetize its accounts on an ongoing basis pursuant to the Factoring Agreement is essential to the Debtor's continuing operations.  Without this, the Debtor will be unable to fund its expenses for future operations and will be forced to discontinue its operations.  The Debtor's continuing ability to sell accounts to nFusion pursuant to this arrangement on a post-petition basis is essential to fund and preserve the Debtor's business operations and the value of its business and assets.

11. The Debtor cannot replace the funds obtained through the Factoring Agreement through credit extended to it in the ordinary course of its business, or based on granting an unsecured, administrative claims in this bankruptcy case in exchange for such credit.  Because the Debtor's assets are burdened with liens or security interests, including the Factoring Agreement with nFusion and the below described financing arrangements covering the Debtor's inventory and a lease covering the Debtor's equipment, funds are not readily available to the Debtor through a secured loan against its accounts, other than through extending the Factoring Agreement with nFusion on a post-petition basis as described in the nFusion Motion.  Under the Debtor's current circumstances, the only option presently available to the Debtor to extract money from the accounts on a timely basis to provide needed operating cash is through the Factoring Agreement with nFusion.

12. The nFusion Motion proposes to continue to treat the pre-petition purchases of Accounts by nFusion as provided in the Factoring Agreement.  This includes the continued collection of the Accounts by nFusion and the application of the proceeds to the Debtor's obligations.  nFusion will receive replacement liens to the extent of a diminution in the value of

---

financing agreement.

its pre-petition collateral to secure the Debtor's obligation.

13. The nFusion Motion proposes to provide for the continued purchase of Accounts post-petition pursuant to the terms of the Factoring Agreement on the same terms as described above.

14. nFusion and the Debtor are parties to an Intercreditor Agreement ("Intercreditor Agreement") dated March 4, 2022, with the Debtor's inventory lender, Crossroads Funding II, LLC ("Crossroads"). The transactions with nFusion relating to the sale of accounts, both pre-petition and post-petition, will remain subject to the Intercreditor Agreement in all respects.

15. nFusion, Crossroads, the Debtor, and Utica Leaseco, LLC ("Utica") are parties to an Intercreditor Agreement and Amendment ("Utica Intercreditor Agreement"). While the Debtor does not believe that the nFusion Motion implicates the equipment which is leased by Utica to the Debtor, the transactions with nFusion pursuant to the nFusion Motion will remain subject to the Utica Intercreditor Agreement as well.

### III. The Crossroads Inventory Motion

16. Crossroads and the Debtor are parties to a Loan and Security Agreement ("Loan Agreement") which is basically an asset-based loan facility primarily secured by the Debtor's inventory. The Loan Agreement is addressed in detail in the *Emergency Motion for (i) Interim and Final Orders (a) Authorizing Debtor to Incur Post-Petition Secured Indebtedness, (b) Granting Security Interests and Super-Priority Claims, and (c) Authorizing the Use of Cash Collateral and Granting Adequate Protection; and (ii) an Order Scheduling a Final Hearing* ("Crossroads Motion") filed by the Debtor substantially contemporaneously with the filing of this Declaration. Reference is here made to the Crossroads Motion which accurately describes the existing facility under the Loan Agreement with Crossroads. The post-petition transactions with Crossroads will continue to be subject to both the Intercreditor Agreement and the Utica Intercreditor Agreement. However, the Debtor does not believe that the equipment leased from

Utica is implicated with respect to the Crossroads Motion.

17. The Loan Agreement provides for additional advances by Crossroads based on a formula tied to the value of the inventory. The Crossroads Motion allows, but does not require Crossroads to make advances to Debtor. It also allows the Debtor to use Crossroad's cash collateral to acquire other inventory on a post-petition basis. The ability of the Debtor to monetize its inventory on an ongoing basis pursuant to the Loan Agreement through the sale of finished goods and the use of the resulting cash collateral to purchase new inventory is essential to the Debtor's continuing operations. This arrangement with Crossroads based on the inventory are necessary to fund the Debtor's future operations. The proposed arrangement with Crossroads is essential to preserve the Debtor's business operations and the value of its business and assets.

18. The Debtor cannot replace the arrangement pursuant to the Loan Agreement with funds obtained through the extension of credit to the Debtor in the ordinary course of its business, or based on granting unsecured, administrative claims in this bankruptcy case in exchange for such credit. Because of the liens burdening the Debtor's assets, including the Loan Agreement and the Factoring Agreement with nFusion, funds are not readily available to the Debtor through secured loans against its inventory other than through extending the Loan Agreement with Crossroads on a post-petition basis as described in the Crossroads Motion. Under the present circumstances, the only manner through which the Debtor can obtain the necessary additional operating funds through its inventory is through the proposed arrangement with Crossroads as set forth in the Crossroads Motion.

### IV.     The Initial Budget

19. The Debtor's initial operating budget ("Initial Budget") was derived through negotiations among the Debtor (including the Debtor's financial advisor), nFusion and Crossroads. As reflected below, the Initial Budget is included as an Exhibit in the Debtor's

Witness & Exhibit List for the first day hearings.  The Debtor believes that the Interim Budget and the form of the interim orders granting the nFusion Motion and the Crossroads Motion have been respectively approved by nFusion and Crossroads.

## V.   The Utility Motion

20.   In connection with the operation of their businesses, the Debtor obtain Utility Services from different utility companies (collectively, the "Utility Companies").  The Debtor has filed an *Emergency Motion Pursuant to 11 U.S.C. § 366(b) for an Interim and Final Order (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service, (II) Deeming Utility Companies Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment* ("Utility Motion") filed substantially contemporaneously with this Declaration.  A list identifying the Utility Companies providing services to the Debtor is attached to the Utility Motion as Exhibit "A".  The Debtor believes that the Utility Companies listed on Exhibit "A" to the Utility Motion are the only suppliers of utility services to it.  However, to the extent that the Debtor later determines that it receives utility services from providers not included on Exhibit "A," such other providers shall be included within this Motion's definition of "Utility Companies" and the services they provide included within this Motion's definition of "Utility Services," such that the relief requested herein and the procedures for implementation thereof shall fully extend to and apply with equal force and effect to any such additional providers.

21.   Historically, the Debtor has paid all amounts owing to the Utility Companies on a timely basis in the ordinary course of business.  To the best of the Debtor's knowledge, the Debtor is current on undisputed invoices for Utility Services.  The Debtor intends to continue to pay the Utility Companies after filing a timely basis in the ordinary course of business.

22.   Uninterrupted Utility Services are essential to the ongoing business operations of the Debtor.  Thus, if the Utility Companies are permitted to terminate Utility Services, the

7

Debtor's operations will be irreparably harmed and the Debtor's ability to reorganize will be jeopardized.

### VI.     The Cash Management Motion

23.     The Debtor has also filed an *Emergency Motion For Entry Of Interim And Final Orders (I) Authorizing The Debtor To (a) Operate Its Cash Management System, (b) Honor Certain Pre-Petition Obligations Related Thereto, and (c) Maintain Existing Business Forms, And (II) Granting Related* ("Cash Management Motion") filed substantially contemporaneously with this Declaration.  The relief sought in the Cash Management Motion is necessary to provide a smooth transition by the Debtor into this bankruptcy case and to allow the smooth and uninterrupted use and management of the Debtor's cash in the most efficient way possible consistent with the continued operation of the Debtor's business.

### VII.    The Wage and Employee Benefit Motion

24.     The Debtor has also filed an *Emergency Motion for Interim and Final Orders (I) Authorizing the Debtor to (a) Operate Its Cash Management System, (b) Honor Certain Pre-Petition Obligations Related Thereto, and (c) Maintain Existing Business Forms, and (II) Granting Related Relief* ("Employee Motion") filed substantially contemporaneously with this Declaration.  Reference is made to the Employee Motion which accurately describes the Debtor's employee obligations and benefits.

25.     The Debtor employs approximately 167 people, most of whom are hourly employees employed at the Debtor's production facility in Columbus, Ohio.  The Debtor is a highly skilled and trained workforce, which includes experienced, skilled production workers at the manufacturing facility, a knowledgeable and experienced sales force, and an experienced management team.  The Debtor pays its hourly employees bi-weekly.  Each such bi-weekly, hourly payroll is approximately $350,000.  It is essential that the Debtor's hourly employees be paid fully and in a timely manner to preserve the value of this workforce and to prevent the loss

of employees and harm to employee morale.

26. The Debtor's last two-week pay period for hourly employees ended on Sunday, June 4, 2023, and represented total obligation by the Debtor to the employees of approximately $350,000. The Debtor had already made the transfer of the funds for this payroll period to the payroll company prior to the Petition Date, although the hourly employees will not be paid by the payroll company until after the Petition Date, and believes that this payment constituted a pre-petition transfer of such funds.

27. The next two-week pay period for the hourly employees began on June 5, 2023 and runs through June 18, 2023 and is also expected to be in the approximate amount of $350,000. The Debtor seeks approval to pay the employees for the pre-petition portion of this period, which is only a few days.

28. The sum of the gross wages paid to any single employee for the two-week period ended June 4, 2023, plus the pre-petition portion of any such hourly wages for the next pay period beginning June 5, 2023, does not exceed $15,150 for any single hourly employees.

29. Prompt and full payment of these pre-petition wages, as well as honoring the employee's vacation days and the reimbursement of expenses to such employees, is necessary to maintain the work force and continue the Debtor as an operating entity.

30. The Company's salaried employees are being paid for the period from May 29 through June 11, 2023. The total compensation anticipated to be payable to the Company's salaried employees for this period is approximately $230,000. The compensation paid to any single salaried employee for this pay period is less than $15,150. These salaried employees include the Debtor's executives and its leadership group. It is essential to pay these salaried employees fully and on a timely basis to maintain intact the Company's leadership.

31. Is also essential that, as to both hourly and salaried employees, that the Debtor

be allowed to continue to provide expense reimbursement. This includes auto mileage reimbursement, tool allowances for workshops, travel expenses, and reimbursement for other necessary job-related expenses. Reimbursement of some expenses requires the employee to complete and submit an expense form to a supervisor for approval. The reimbursement for these expenses are sent to the accounting department for reimbursement with the next payroll cycle. Other expenses may be pre-approved as necessary and appropriate. None of the reimbursements to any single employee will result in a payment to any such employee in excess of the $15,150 priority wage claim cap provided in section 507(a)(4)(A) of the Bankruptcy Code.

32.     The Company also provides general welfare benefits to its employees, including medical insurance, dental insurance, vision insurance, life insurance, vehicle allowances, vacation pay, and paid leave (collectively, the "Employee Benefits"). These are described in detail in the Employee Motion. Cessation of such benefits would drastically disrupt employee morale and would cause key employees to either leave or to absent themselves from work. In any case, failure to pay the Employee Benefits would undermine the Debtor's relationship with its employees and hinder the reorganization effort. The payments as to any single employee are not expected to result in payments of any employee in excess of $15,150.

33.     Certain of the Debtor's employees, particularly the Debtor's sales personnel, are entitled to receive sales commissions ("Commissions") as an incentive to produce and increase sales. These Commissions are paid quarterly, and the next payment will encompass the period from April 1, 2023, through June 30, 2023. These Commissions are described in detail in the Employee Motion.

34.     The pre-petition Commissions for three (3) of the salespeople are expected to exceed the $15,150 priority claim cap. The commissions and reimbursement for auto allowance for these three persons will respectively exceed the $15,150 cap by approximately $5,700, $5,350, and $74,300.

35. However, similar to the situation of a critical vendor, these salespeople are essential to the Debtor's ability to obtain new business and continue its business entering Chapter 11. These salespeople are not replaceable in the near term, and the failure to pay the earned commissions would potentially undermine the Debtor's relationship with these essential salespeople and, as a consequence, cause irreparable harm to the Debtor's estate and business. Moreover, these salespeople have personal relationships with the customers, something that cannot be readily replaced or replicated. In particular, losing or disincentivizing these people would adversely impact one of the Debtor's important assets, its $40 million backlog. Consequently, the Debtor requests permission to pay these Commissions even if the pre-petition amount payable to a single employee exceeds the $15,150 priority claim cap. This is necessary to avoid losing the services of an essential part of the Debtor's sales organization whose services are essential to the Debtor's ongoing, post-petition operations.

## VIII. The Exhibit List

36. The Debtor's Witness & Exhibit List ("W&E List") for the First Day Hearings is attached hereto as **Exhibit "A"**. The exhibits relating to the nFusion Motion and Crossroads Motion are reflected as Exhibits "5" through "22" in the W&E List. All such documents are true and correct copies of the original documents which are maintained in the Debtor's files and business records, as a part of its business records. The UCC-1 financing statements (Exhibits "16" through "21") are true and accurate copies of those filed with the Delaware Secretary of State and the Texas Secretary of State.

37. The proposed Initial Budget is attached as Exhibit "22" to the W&E List.

## IX. Conclusion

38. Pursuant to 28 U.S.C., section 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated this 6th day of June, 2023

_____
Greg Hatfield

**CERTIFICATE OF SERVICE**

      The undersigned certifies that, on June 6, 2023, a true and correct copy of the foregoing document was served via email, via the Court's Electronic Case Filing (ECF) system, or via first class mail, as applicable, upon (i) the United States Trustee for the Southern District of Texas; (ii) the parties included on the Debtor's list of holders of the 30 largest unsecured claims against the Debtor; (iii) all of the Debtor's known secured creditors; (iv) the United States Attorney's Office for the Southern District of Texas; (v) the Internal Revenue Service; (vi) the Texas Attorney General; (vii) the creditors named on the Debtors' Form 204 "20 Largest Creditors List"; (viii) those persons who have formally appeared and requested notice and service in these proceedings; and (ix) all governmental agencies having a regulatory or statutory interest in this case.

/s/ J. Robert Forshey
_____
J. Robert Forshey

L:\BFORSHEY\KW International, LLC #6261(WO)\Pleadings (23-   )\Declaration in Supp of First Day Motions for GHatfiled (final with cash mgmt) (v5) 6.5.23.docx

**SERVICE LIST**
**KW International, LLC**
**23-90708 (DRJ)**
**06/06/2023**

Andrew Jimenez
Travis C. Ross
U.S. Department of Justice
United States Trustee Program
606 N Carancahua St, Ste 1107
Corpus Christi, TX 78401

US Trustee
Office of the US Trustee
515 Rusk Ave, Ste 3516
Houston, TX 77002

United States Attorney Office
for the Southern District of Texas
1000 Louisiana, Ste. 2300
Houston, TX 77002

Internal Revenue Service
Centralized Insolvency Operations
PO Box 7346
Philadelphia, PA 19101-7346

Office of the Attorney General
PO Box 12548
Austin, TX 78711-2548

Andrew G Edson
Robert P. Franke
Clark Hill PLC
901 Main Street, Suite 6000
Dallas, Texas 75202-3794

Winsupply of East
Houston, TX dba MSI S
PO BOX 24279
Houston, TX 77229

Absolute Metal Products LLC
PO Box 4356 Dept 625
Houston, TX 77210-4356

3-C Valve & Equipment
P.O. Box 5345
Kingwood, TX 77325-5345

American Alloy Steel, Inc.
P.O. Box 40469
Houston, TX 77240-0469

PSS Industrial Group Corp
10507 Ella Blvd, Suite 1
Houston, TX 77038

ABB Inc.
P.O. Box 88868
Chicago, IL 60695-1868

Jatco, Inc.
244 NW 111th
Oklahoma City, OK 73114

Sepco Process, Inc.
3290 Avenue M Ext.
Conroe, TX 77301

Luke Industries, LLC
Corporate Billing, LLC
Dept . 100
PO Box 8364
Birmingham, AL 35283

Trinity Heads, Inc
P.O. Box 732666
Dallas, TX 75373-2666

ProFire Energy Inc.
321 South 1250 West
Suite 1
Lindon, UT 84042

Flow-Zone, LLC
Dept 248 P.O. Box 6762
Dallas, TX 75267

Canalta USA Corp
1210 Duncan St, Bldg 5
Ste 2
Denton, TX 76205

Daniel OpCo, LLC
FKA Micro Motion
975 W Sam Houston
Pkwy N, Ste 1
Houston, TX 77064

TTS, LLC
P.O. Box 654168
Dallas, TX 75265

Vallen Distribution, Inc
P.O. Box 404753
Atlanta, GA 30384

Acuren Inspection Inc.
2040 Trade Drive
Midland, TX 79706

Distribution Now
P.O. Box 200822
Dallas, TX 75320-0822

Gulf Coast BusinessCredit
3009 Hohl St
Houston, TX 77093

TRALTO Management
Co, LLC
8827 W. Sam Houston
Pkwy. N, Ste 2
Houston, TX 77040

Consolidated P and S Inc.
19823 Skycountry Lane
Houston, TX 77094

Stark Solutions LLC
10816 Northridge Drive
Conroe, TX 77303

M G Insulation
2115 Marshall St.
Pasadena, TX 77506

Eads Distribution, LLC
P.O. Box 712465
Cincinnati, OH 45271

Mako Oilfield Services, LLC
12633 Reed Road
Sugarland, TX 77448

Chase Controls LP
702 South Persimmon Suite 1C
Tomball, TX 77375

Precise Steel International, LLC
909 Marcella St.
Houston, TX 77091

Endress + Hauser, Inc.
Dept 78795
P.O. Box 78
Detroit, MI 48278-0795

Kinetic Engineering Corporation
16810 Barker Springs Road
Ste. 218
Houston, TX 77084

Evolution Metal Tech LLC
7108 East Fwy
Baytown, TX 77521

nFusion Capital Finance, LLC
6444 Burnet Road, Ste. 100
Austin, TX 78757

Crossroads Financial, LC
6001 Broken Sound Parkway NW
Suite 620
Boca Raton, FL 33487

Utica LeaseCo, LLC
905 South Boulevard East
Rochester Hills, MI 48307

Crossroads Financial, LLC
6001 Broken Sound Parkway, #62
Boca Raton, FL 33487